UNITED STATES of America ex rel.
Bruce BARKSDALE,
Petitioner-Appellant,

v.

Frank BLACKBURN, Warden, Louisiana
State Penitentiary,
Respondent-Appellee.

No. 78–2582.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1980.

John Wilson Reed, New Orleans, La. (Court-appointed), for petitioner-appellant.

William F. Wessel, Asst. Dist. Atty., New Orleans, La., John S. Baker, Jr., Baton Rouge, La., for respondent-appellee.

Before GOLDBERG, AINSWORTH and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge.

Appellant Bruce Barksdale appeals from the denial of his petition for a writ of habeas corpus. For the reasons stated below, we reverse.

## I. *Facts*:

In July 1963, Barksdale was convicted of aggravated rape and was sentenced to death[1] by an Orleans Parish jury. He had been indicted by the September 1962 Orleans Parish Grand Jury. Through appropriate motion, Barksdale challenged the racial composition of the venire from which the grand jury which indicted him and the petit jury which would try him were chosen. After a hearing, both motions were denied. Barksdale appealed his conviction, again challenging the composition of the grand and petit juries. The Louisiana Supreme Court affirmed the conviction, reasoning that educational and economic factors explain the disparity between the number of black males in the population and the number of blacks appearing on the jury wheel. *State v. Barksdale*, 247 La. 198, 170 So.2d 374, 381 (1964), *cert. denied*, 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236 (1965).

Relying partially on this court's decision in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), Barksdale next pursued state habeas corpus. Again, the Louisiana Supreme Court denied his petition, *State ex rel. Barksdale v. Dees*, 252 La. 434, 211 So.2d 318 (1968). Three years later Barksdale filed a petition in federal court for a writ of habeas corpus. His case was consolidated with that of John Newman[2] for the purpose of an evidentiary hearing before a United States magistrate. After the hearing before the magistrate, the cases were separated and sent back to the judges to whom the cases initially had been assigned. The convictions of both Newman and Barksdale were set aside. The State appealed the decision in the *Newman* case, but did not immediately do so in the *Barksdale* case. The decision of the district court in the *Newman* case was affirmed. *Newman v. Henderson*, 539 F.2d 502 (5th Cir. 1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977).[3]

Four months after the district court's decision in the *Barksdale* case, the State requested permission, which was granted, to file a belated notice of appeal. That appeal was dismissed by this court upon motion of Barksdale. *Barksdale v. Henderson*, No. 73–1536, *cert. denied*, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974). Meanwhile, the State moved to vacate the original judgment in accordance with Federal Rules of Civil Procedure, Rule 60(b)(4) on the ground that the hearing before the magistrate was an improper delegation of authority under *Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974). The motion was granted and appealed unsuccessfully by Barksdale, *Barksdale v. Henderson*, 510 F.2d 382 (5th Cir.), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975).

An evidentiary hearing was held by District Judge Christenberry, who died while the case was under consideration. Upon agreement of the parties, another evidentiary hearing was held before Judge Schwartz. As he had done at the previous hearing, Barksdale presented the testimony of Dr. Arnold Levine, a statistician, and Julian Murphy, a jury commission employee. The State, for the first time, introduced the testimony of Dr. David Smith, a statistician, to rebut in part the testimony of Dr. Levine. The court denied the petition for habeas corpus.

Because of a factual error committed by the district court, Barksdale moved for and was granted a new hearing.[4] At this hearing additional evidence was introduced both by the State and by Barksdale. The district

---

1. In an independent state court proceeding, the death sentence was set aside and a life imprisonment sentence imposed.

2. Newman had been indicted in an unconnected case by the September 1962 Orleans Parish Grand Jury.

3. This court expressly declines to decide whether the *Newman* decision could collaterally estop the State of Louisiana from relitigating the legality of the September 1962 Grand Jury.

4. The district court erroneously viewed a 13% statistic in the record to refer to the percentage of blacks included in the total of those summoned to be qualified by the jury commission. The 13% actually referred to the percentage of blacks on certain final petit venires.

court again denied the petition for habeas relief. It is from that order that the petitioner appeals to this court.

Despite its lengthy history, the primary issue in this case is relatively simple: Was the system of selecting grand and petit jurors in Orleans Parish at the time Bruce Barksdale was indicted and tried one which discriminated against blacks in violation of Barksdale's equal protection and due process rights? In addition to the primary issue, there are several collateral issues. The State urges on appeal that Barksdale's habeas claim should not be cognizable under the rationale of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); that an evidentiary hearing should not have been held on the petition as there had been a full and fair hearing on the claim in state court; and, finally, that the petition is barred by Rule 9 of 28 U.S.C. § 2254.

To decide the primary issue of unlawful discrimination this court has been presented with a mass of statistics representing various views of the disparities which existed between the black population of the parish and the percentage of blacks at various phases in the jury selection process. Our task has been made more difficult by the fact that the State changed its explanation of the statistics between the time it proposed findings of fact to the district court and the filing of its brief in this court.

The district court found the following facts:

In 1962 blacks constituted 38.8% of the Orleans Parish population.

In 1963 blacks constituted 39.5% of the Orleans Parish population.

In 1962 blacks constituted 33.7% of the male population aged 21 through 64.

In 1963 blacks constituted 34.4% of the male population aged 21 through 64.[5]

The court found that while Levine concluded in his report that in 1962, 32% of the literate male population aged 21–64 not occupationally exempt from jury service was black and that in 1963, 32.7% of the same population was black, Levine had left "literate" undefined. The court referred to the Levine report which indicated that of the male population aged 21–64 not occupationally exempt, in 1962, 31.9% with at least five years of education was black, 30.9% with at least six years of education was black, and 29.7% with at least seven years of education was black. The court observed that no comparable data for 1963 had been presented. The court also found that Levine's report indicated that in 1962 blacks constituted approximately 17% of the registered voters.

The court further found:

As of January 1, 1962, prior to drawing of the venire, blacks constituted approximately 14.9% of the general venire as embodied in the Orleans Parish jury wheel from which grand and petit jury venires were drawn. As of January 1, 1963 blacks constituted no more than 14.3% of the persons in the general venire as embodied in the Orleans Parish jury wheel. As of January 1, 1964 blacks constituted no more than 14% of the persons in the general venire, as embodied in the Orleans Parish jury wheel. In 1962 blacks constituted 13.9% of all persons appearing on the final petit jury venires. In January, June, and July, 1963 blacks constituted 21.8% of all persons appearing on final petit jury venires and blacks constituted 17.3% of the persons appearing on the final petit jury venire called into Section E in July 1963 for the trial of petitioner's case (Stipulation D). There were apparently no blacks on the petit jury that tried petitioner's case (Stipulation C).

The disparity between the presumptively eligible population of black males of 21–64 in 1962 (33.7%) and the grand jury venire (14.9%) of January, 1962 is 18.8%.

The disparity between the presumptively eligible population of black males

---

5. Findings of Fact of District Court, p. 3.

of 21–64 in 1962 (33.7%) and the final petit jury venire in 1962 (13.9%) is 19.8%.[6]

Although we are bound by the clearly erroneous standard when reviewing the findings of fact of the district court, *Wade v. Mayo*, 334 U.S. 672, 683–84, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948), we are not bound by errors of law. Because the district court improperly applied the law to the facts, we reverse.

## II. *Habeas Corpus Issue*

■ The State contends that Barksdale's claim of grand jury discrimination is not a proper issue for federal habeas corpus.

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494, 96 S.Ct. at 3052.

Relying on a dissenting opinion in *Castaneda v. Partida*, 430 U.S. 482, 508 n. 1, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the State urges that *Stone v. Powell* be extended to foreclose a grant of federal habeas corpus relief to a state prisoner who claims discrimination in the selection of the grand jury. It argues that habeas corpus relief should be available only where the error alleged affected the determination of guilt, and that in this case, as in *Stone v. Powell*, no error affected the trial on the merits.

These same arguments for extending *Stone v. Powell* were considered and rejected recently by the Supreme Court in *Rose v. Mitchell*, —— U.S. ——, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), a case involving alleged racial discrimination in the selection of Tennessee grand jury foremen.

Writing for the majority, Mr. Justice Blackmun pointed out that in *Stone v. Powell* the Court confined its ruling to cases involving the judicially created exclusionary rule, which had minimal utility when applied in a habeas corpus proceeding.

Mr. Justice Blackmun noted that there were fundamental differences between Fourth Amendment exclusionary rule claims and allegations of discrimination in the grand jury selection process. A discrimination charge is an allegation that the state judicial system itself violated the Equal Protection Clause, whereas in Fourth Amendment cases, courts are called upon to evaluate the actions of the police in seizing evidence. By allowing federal habeas review, we ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate the process. In this manner we uphold the integrity of our judicial system.

The Court admitted that reversal of a conviction solely on the basis of discrimination in the jury selection process involves costs to society. However, those costs are "outweighed by the strong policy the Court consistently has recognized of combatting racial discrimination in the administration of justice." 99 S.Ct. at 3001.

We therefore hold that Barksdale's claim of grand jury discrimination is cognizable in federal habeas corpus.

## III. *Evidentiary Hearing*

■ The State next argues that an evidentiary hearing should not have been held by the district court and urges this court to determine the adequacy of the State records and to base its decision thereon.

Since Barksdale's filing of his petition for a writ of habeas corpus in 1971, there have been three evidentiary hearings.

Prior to the first evidentiary hearing in October 1972, the district court ordered the State to inform it of any reasons for not holding the hearing. The State made no objections. The judgment that resulted from this hearing, however, was set aside by the district court on the State's motion under Rule 60(b)(4), Fed.R.Civ.P., because the evidentiary hearing before the magis-

---

6. Findings of Fact of District Court, p. 3–4 (footnotes omitted).

trate was invalid under *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974). A new evidentiary hearing was ordered at that time. Barksdale appealed that ruling to this court. During the appeal, the State argued that no evidentiary hearing should have been held. This court affirmed the district court's order and required a new evidentiary hearing to be held on the petitioner's claim that blacks were systematically excluded from Orleans Parish juries at the time of his trial. *Barksdale v. Henderson,* 510 F.2d 382 (5th Cir.), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). Although Barksdale unsuccessfully sought a writ of certiorari to review the judgment, the State did not seek a writ of certiorari on the issue of whether there should have been an evidentiary hearing. Therefore, our order requiring an evidentiary hearing is a final resolution of that issue.

In September 1975, over the State's objections, District Judge Christenberry conducted the evidentiary hearing as directed by this court. Barksdale called the same two witnesses, Arnold Levine, a statistician, and Julian Murphy, a jury commission employee, who had testified at the original evidentiary hearing conducted jointly with Newman and upon whose testimony the *Newman* decision was based. After Judge Christenberry died, the State moved to reopen the record to submit the expert testimony of its own statistician and to introduce testimony contained in state court records of companion cases to the *Barksdale* case at the time of Barksdale's original trial. The motion was resolved by an agreement by both parties to conduct a new evidentiary hearing.

In October 1976, the third evidentiary hearing was held. Barksdale again called Murphy and Levine. The State called its own statistician, Smith, to dispute part of Levine's testimony. The State also introduced city directories, illustrative of the techniques used by the jury commission to select jurors, and introduced a 1964 stipulation from a state court proceeding to which Barksdale had not been a party concerning the testimony the then chairman of the Orleans Parish Jury Commission would have given if he had testified in that state proceeding. On April 1, 1977, the district court entered an order denying Barksdale's petition for a writ of habeas corpus.

It is clear that throughout the history of this habeas corpus action, the State has had ample opportunity to voice its objections to holding evidentiary hearings. Prior to the first evidentiary hearing it was ordered to give reasons for not holding an evidentiary hearing; it gave none. When the first evidentiary hearing was overturned, the State in its brief argued against the holding of an evidentiary hearing, but failed to petition for certiorari when this court ruled against it on that issue. Finally, after Judge Christenberry's death, the State *consented* to a new evidentiary hearing. Given these facts, we cannot agree that the district court erred in holding a new evidentiary hearing.

The legal basis for the State's argument that a new evidentiary hearing should not have been held is 28 U.S.C. § 2254(d) which provides:

> (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
>
> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3) that the material facts were not adequately developed at the State court hearing;
>
> *    *    *    *    *    *

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

The resolution of the issue of jury discrimination is a mixed question of law and fact. The "factual" determinations made by state habeas courts which federal courts must presume to be correct pursuant to § 2254(d) do not include mixed questions of law and fact. *Townsend v. Sain*, 372 U.S. 293, 309 n.6, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Mason v. Balcom*, 531 F.2d 717 (5th Cir. 1976).

As we stated in Part II of *West v. Louisiana*, 478 F.2d 1026, 1031–32 (5th Cir. 1973), *aff'd and adhered to in relevant part*, 510 F.2d 363 (5th Cir. 1975) (en banc), a case dealing with effectiveness of counsel:

> Regardless of the thoroughness of state factfinding procedures, considerations of comity do not obligate federal courts in habeas corpus cases to defer to state determinations on matters of federal law. The obligation of the federal judge is the opposite: to apply the proper federal constitutional standards based on the underlying facts, although the conclusions drawn from the facts may differ from the state court's conclusions. (Citations omitted.)

> Where state factfinding procedures are adequate, comity and judicial economy dictate that the federal courts should not hold separate evidentiary hearings. To hold a federal hearing is to call state factfinding procedures into question. But comity does not govern the application by federal courts of their independent judgment as to federal law. That is their obligation in all cases, an obligation the district court in this case properly discharged.

*See also Lee v. Hopper*, 499 F.2d 456, 462 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 633, 42 L.Ed.2d 650 (1974).

■ Specific historical facts found by a state habeas court, to which a standard of law is applied in deciding a mixed question of law and fact, merit a presumption of correctness in a federal habeas proceeding, *West v. Louisiana, supra* at 1031–32, provided that those facts were adequately developed and fairly supported by the record. 28 U.S.C. § 2254(d)(3) & (d)(8).

In the present case the district court did not ignore the specific historical facts found by the state habeas court. Neither was there the wholesale reexamination of fact that the Supreme Court found objectionable in *LaVallee v. Delle Rosa*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973). Instead the district court simply reassessed and redetermined legal issues upon the factual record developed in the state court.

■ Such a reorganization of a voluminous and complicated record is not precluded by § 2254(d).

Although the federal habeas court essentially relied upon the specific facts concerning the operation of the Orleans Parish jury

system and the composition of venires and panels already determined in the state court, these facts were supplemented in the federal habeas court. This supplemental evidence consisted primarily of: (1) testimony by Levine, Barksdale's statistical expert; (2) statistical fact evidence introduced by the State concerning the January, June and July 1963 petit venires; and (3) testimony by Murphy, the jury commission employee directed only to establishing the fact that jury commission employees attempted to avoid subpoenaing persons who would not be paid by their employers during their days of jury service. Levine's testimony was used primarily to present and explain statistics that already existed in the state court record. The State cannot now attack its own introduction of evidence. Murphy's testimony is testimony which the Louisiana Supreme Court had barred Barksdale from presenting when Barksdale filed his first writ of habeas corpus in 1967, a writ based in part on this court's decision in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), and for which the testimony of Murphy was necessary. *State ex rel. Barksdale v. Dees*, 252 La. 434, 211 So.2d 318 (1968). With respect to that aspect of the case, the district court might well have found that Barksdale did not "receive a full, fair and adequate hearing in the State court proceedings." 28 U.S.C. § 2254(d)(6).

What the district court did below and what we do now is to exercise our federal judicial power to examine and analyze the facts of record in order to determine whether the system of jury selection at the time in question was operated to systematically exclude blacks.[7]

As the Supreme Court stated in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963):

Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas. 372 U.S. at 318, 83 S.Ct. at 760.

IV. *Dismissal Pursuant to Rule 9(a)*

The State argues that Barksdale's petition should have been dismissed under Rule 9 of the rules governing 28 U.S.C. § 2254 petitions because it was not filed until 1971, six years after Barksdale's direct appeal terminated in 1965. Rule 9 incorporates the common law equity concept of laches and provides in pertinent part:

(a) Delayed petitions. A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

Rule 9(a) does not apply to Barksdale's petition because the rules governing § 2254 proceedings do not apply to petitions filed before February 1, 1977. *Jackson v. Estelle*, 570 F.2d 546 (5th Cir. 1978).

We recognize the problems of proof attendant to claims regarding events which occurred a number of years ago. Nevertheless, "Delay alone is no bar to federal habeas relief to correct jurisdictional and constitutional trial errors." *Hamilton v. Watkins*, 436 F.2d 1323, 1326 (5th Cir. 1970). Indeed, the delay in *Jackson v. Estelle, supra,* was over thirty years.

The State in its brief claims it was prejudiced by the delay, but does not explain how. The State does mention in its brief that Daniel Knowles, former Chairman of the Jury Commission, is dead. However, the trial court, without objection from Barksdale, permitted the State to in-

---

7. It should be noted that in *Goins v. Allgood*, 391 F.2d 692, 696–97, 699 n. 6 (5th Cir. 1968), this court expressed the view that the Louisiana Supreme Court's conclusions of law in its *Barksdale* opinion did not comport with the appropriate constitutional standards.

troduce a stipulation from an independent state court record (not involving Barksdale) concerning the testimony that Knowles would have given. Furthermore, it is difficult to comprehend in what manner the State could be prejudiced when the issues raised on federal habeas corpus are for the most part those originally raised by Barksdale at trial. The State at that time had and exercised an opportunity to adduce evidence concerning these issues.

Barksdale has been anything but laggard in pursuing habeas relief. Two years after the Supreme Court terminated his direct appeal by denying his application for certiorari in *Barksdale v. Louisiana,* 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236 (1965), Barksdale filed his first state habeas petition, reurging the jury discrimination claims as elaborated in *Labat v. Bennett,* 365 F.2d 698 (5th Cir. 1966), *cert. denied,* 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967). This petition was terminated in 1968. In 1970, when he was under sentence of death, Barksdale filed a second state habeas petition raising issues arising under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In 1971 the state district court and the Louisiana Supreme Court rejected the petition. In the same year, the present federal habeas petition was filed, combining the original jury discrimination issues and the *Witherspoon* issues.

We hold that the delay in filing the federal habeas petition was not prejudicial to the State and was not caused by lack of diligence on the part of Barksdale. Furthermore, because Rule 9(a) became effective on February 1, 1977 and cannot be applied retroactively, it does not apply to Barksdale's federal habeas petition which was filed in 1971.

## V.  *Merits of Barksdale's Claim*

It is Barksdale's claim that he was denied equal protection of the laws by being tried on the basis of an indictment returned by a grand jury and before a petit jury from which members of his race were intentionally excluded.  *See Rose v. Mitchell,* ——

U.S. ——, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979);  *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In order to prevail, Barksdale must prove a prima facie case of discrimination which is unrebutted by the State.

■ A prima facie case of jury discrimination is proved as follows:

The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. . . . Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280 (1977) (citations omitted). If the plaintiff establishes a prima facie case, the burden shifts to the State to show that the disparity exists not because of unlawful discrimination but because of the effect of race-neutral factors. We hold that Barksdale established a prima facie case, and that case was not rebutted by the State of Louisiana.

The most recent Supreme Court explication of the components of a prima facie case of jury discrimination is found in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In *Castaneda* the habeas petitioner argued that Spanish surnamed individuals were discriminated against in the selection of grand jurors. The evidence showed that in 1970, Spanish surnamed individuals comprised 79.1% of the county population. The majority compared that population figure to 39%, the average percentage of Spanish surnamed individuals which had served on grand juries over the ten-year period of 1962–1972, to hold that

the petitioners had proved a prima facie case of discrimination.[8]

The Court made it clear that the burden of reducing general population statistics to more meaningful statistics rests on the State, a position vigorously opposed by the dissent. According to the dissent, the problem with using general population statistics is that included are those who obviously are unable to serve on a jury: children, individuals occupationally exempt, persons exempt because of old age, and illiterates. While such factors may be legitimate considerations in narrowing the population, the majority specifically refused to rest its holding that the petitioner had proven a prima facie case on the 20% disparity which existed between a narrowed population and jury participation, making it apparent that the State has the burden of proving such factors. 430 U.S. at 488–89 n. 8, 97 S.Ct. 1272.

It should be noted, however, that prior to *Castaneda,* the Court was not consistent as to which statistics it approved for comparison purposes. Because the disparity is generally altered[9] when one turns from general population data to statistics concerning the portion of the population which is presumptively eligible to serve on juries, it is crucial to hold constant the statistics being used when comparing cases. The Supreme Court in *Castaneda* established that the State may rebut the plaintiff's case by showing that little or no disparity exists in a narrowed population. 430 U.S. at 498–99, 97 S.Ct. 1272. In order to determine whether Barksdale has made a prima facie showing in the first instance, however, the statistics he urges on this court must be compared to similar statistics in prior cases.

In several cases the Supreme Court and courts of appeals have compared general population statistics to the percentage of people from a given group appearing on jury venires. Thus, in *Castaneda, supra,* the Court found that the petitioner had proved a prima facie case by showing a 40% disparity between the percentage of Spanish surnamed individuals in the county and the average percentage of Spanish surnamed individuals on grand juries over the past ten years. In prior decisions the Court had indicated prima facie cases were proved upon showing disparities of 23%, *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), 14%, *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), 33%, *Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970),

8. Comparing the percentage of Spanish surnamed individuals in the county in 1970 to the average percentage of Spanish surnamed individuals which served on grand juries over a ten-year period is admittedly a suspect statistical procedure. If there had been a dramatic rise in the overall percentage of Spanish surnamed individuals in the county over the ten-year period in question, the statistical disparity derived by the comparison made by the Court would be skewed in favor of the defendant. The Court acknowledged this problem, indicating it was relying on the assumption that the percentage of Spanish surnamed individuals had remained constant over the period in question. 430 U.S. at 495 n. 15, 97 S.Ct. 1272. The Court also suggested that it was the State's burden to show why the comparison made was not reliable, over and above the fact that it is suspicious from a statistical standpoint. 430 U.S. at 496, 97 S.Ct. at 1272. Thus, if the percentage of Spanish surnamed individuals had increased appreciably, it was the State's burden to show it.

In this case the petitioner has presented census data to prove that the percentage of blacks in Orleans Parish has not remained constant.

In fact, the percentage of blacks increased 4.1% between 1950 and 1960, and then increased by 5.6% between 1960 and 1970. *Population Census,* U.S. Department of Commerce, Bureau of Census, 1950, 2:18, Table 33; 1960, 1:20, Table 20 and Table 27; 1970, 1:20, Table 24. Thus, while the *Castaneda* Court could rely on a presumption that the percentage representation of the group in question did not change appreciably over time, this court cannot do so.

9. To the extent disparate participation by a majority group is explainable by reference to lower educational levels, the use of general population figures results in disparities larger than those which would result if the comparison was made between the literate minority population and the group's participation in the jury system.

Similarly, if a given minority group has fewer children than the norm in the population, the disparity obtained by using general population figures for comparison purposes will be smaller than the disparity which would result if the jury aged population was used.

and 25% and 33%, *Eubanks v. Louisiana,* 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958). These percentages represent the disparities between the percentage representation of the group in question in the general population and its representation in the jury system. A Fifth Circuit case, *Muniz v. Beto,* 434 F.2d 697 (5th Cir. 1970), indicated a prima facie case had been proved upon a showing of a 12% disparity between the percentage of Spanish surnamed individuals in the general population and the percentage which served on fifty successive grand juries. Thus, when comparing percentages of the relevant group in the general population to its representation in the jury system, disparities of 12%, *Muniz v. Beto, supra,* and greater have been held to establish a prima facie case of discrimination.

In other cases, the Supreme Court compared the percentage of minorities in a narrowed population to the percentage of that group appearing in the jury system. The population was commonly narrowed by reducing it to the jury-aged population. Using narrowed population statistics, the Court held a prima facie case was made upon a showing of a 14% disparity in *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The courts also have determined the disparity between the group's representation in the jury-aged population and its representation in the jury system without actually relying on that statistic for a holding that a prima facie case had been proved. *See Jones v. Georgia,* 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (25.7%); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (33.5%); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct.

667, 98 L.Ed. 866 (1954) (11%); *Preston v. Mandeville,* 428 F.2d 1392 (5th Cir. 1970) (13.3%).

Occasionally the Court has considered statistics that are even more narrow than those stated above. For example, in *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), *Jones v. Georgia,* 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), and *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (per curiam), the Court compared the percentage of blacks on the tax rolls from which prospective jurors were selected to the percentage of blacks which actually appeared on jury lists. Using this statistic, the Court held prima facie cases had been proved upon showings of disparities of 18%, 14.7% and 19.7% respectively. Likewise, in a footnote in *Castaneda* the majority narrowed the population to individuals over the age of 25 with some schooling and compared that to the representation on the grand jury. Using this narrowed statistic the Court found a 26% disparity which it termed a "significant disparity." The decision that a prima facie case had been proved, however, was not based on that statistic. 430 U.S. at 488–89 n. 8, 97 S.Ct. 1272.

Depending on which statistics are used, disparities as low as 11% have proved a prima facie case.[10] A disparity of 11% will not, however, necessarily prove a prima facie case. In *Thompson v. Sheppard,* 490 F.2d 830 (5th Cir. 1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975), this court indicated that in the context of a 1983 suit [11] to enforce the rights of blacks and women to serve on grand and petit juries, the jury commission would not

---

**10.** *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). The holding of *Hernandez* was that a 14% disparity between the general population and the group's participation in the jury system proved a prima facie case of jury discrimination. In the opinion, however, the Court indicated there was an 11% disparity between the jury-aged population and the group's participation in the jury system. For purposes of comparison then, to the extent we look to the percentage of blacks in the jury-aged population in Orleans Parish to determine whether a prima facie case has been

made, we must compare Barksdale's statistics to the 11% statistic from *Hernandez.*

**11.** While the courts have typically indiscriminately cited habeas corpus and criminal defendants' challenges together with civil jury discrimination suits, this court has indicated that there are times when a disparity is sufficient to require recomposition in a civil suit, but may not satisfy a criminal defendant's or habeas petitioner's burden of proof. *Berry v. Cooper,* 577 F.2d 322 (5th Cir. 1978); *Porter v. Freeman,* 577 F.2d 329 (5th Cir. 1978).

be required to recompose the jury lists,[12] when there was a disparity of 11% between the percentage of blacks in the total population and the percentage of blacks on the jury list. In that case the jury commission had utilized a system of selection which had no subjective factors in it.[13] The court stated:

> We conclude that a jury list drawn objectively, mechanically, and at random from the entire voting list of a county is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction. The presumption, of course, is rebuttable but the challenger must carry the burden of showing that the product of such a procedure is, in fact, constitutionally defective.

490 F.2d at 833.

In contrast to the rule placing the burden of proof upon the criminal defendant in a challenge to the jury composition, the *Thompson* court appeared to place the initial burden of showing a fair and objective system of jury selection on the jury commission. The fact that an 11% disparity was held not to require recomposition of the jury lists, then, must be evaluated in conjunction with the fact that by all indications the selection procedure was both fa-

cially race-neutral and was not subject to abuse. Transferring the *Thompson* facts into the model for proving jury discrimination in a criminal case, it is conceivable that the court would have held that the petitioner proved a prima facie case by showing the existence of an 11% disparity, but that it was rebutted by the jury commission's showing that the system was racially neutral and not subject to abuse.

In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court held the petitioner had not proved a prima facie case. The petitioner proved there was a 10% disparity [14] between the percentage of blacks in the male population over the age of 21 and the percentage of blacks which appeared on jury venires over a period of years. The Court indicated there was no proof that the jury commissioners were applying their selection criteria differently depending on the race of the prospective juror and that the disparity was so small as to reflect "no studied attempt to include or exclude a specified number of Negroes." 380 U.S. at 209, 85 S.Ct. at 830.

It can be argued, therefore, that the Supreme Court has set 10% as an acceptable disparity, at least where there is no evidence that the system of selection is not racially neutral or is subject to abuse.

**12.** The jury lists had been recomposed once after a preliminary injunction had issued in response to the plaintiff's suit. The plaintiffs argued on appeal that the disparity was still too large, even though all indications were the lists were compiled randomly.

**13.** The new list was compiled by randomly selecting every fourth name from the voter list. This resulted in a list of which 75% were white people and 25% were black people, a mere 5% disparity from the total black population of the county. The selected individuals were sent a racially neutral questionnaire. Some of the questionnaires were returned undelivered to the post office; others were delivered but never returned to the Jury Commission. After the reduction because of non-delivery or non-return of the questionnaire, after striking from the list individuals who asked to be exempt either because of old age, their occupation or because they were women, and after striking those who cited physical disability, were unable to read or write, were away at school or were deceased, the jury commission had a list select-

ed completely through objective standards. That list, however, was composed of 80.8% white individuals and 19.2% black individuals—an 11% disparity between representation on the jury list and representation in the general population.

It is clear that the process of composing the jury list was racially neutral, from start to finish. A similar argument cannot be made about the system for composing jury lists in Orleans Parish at the time of Barksdale's trial, as will be discussed, *infra*.

**14.** The Court characterized the disparity as 10%. 380 U.S. at 209, 85 S.Ct. 824. The evidence showed, however, that blacks comprised 26% of the population over the age of 21. The percentage of blacks on grand and petit jury panels over a period of about 10 years was between 10% and 15%. While the court's representation of the disparity as 10% is, therefore, questionable, the holding rested on there being a small overall percentage disparity. *Id.*

## A. Did Barksdale Prove a Prima Facie Case?

"There is no question, of course, that . . . Negroes, are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws." *Rose v. Mitchell*, 99 S.Ct. at 3005. Accordingly, we must now turn to the statistics Barksdale has presented in support of his allegation that there was systematic discrimination against blacks in the selection of grand and petit jurors in Orleans Parish in the early 1960's.

According to the district court's findings of fact, which largely adopted the proposed findings of fact of the State,[15] blacks comprised 38.8% of the total population of Orleans Parish in 1962 and 39.5% of the Parish in 1963.[16] These percentages should be compared to the representation of blacks on the general jury venire, from which both grand and petit juries were selected. In January 1962, blacks comprised 14.9% of the general jury venire, and by 1964 the number had slipped to 14%.[17] This should be compared to the general

15. The State spent a considerable portion of its brief explaining why the statistics it stipulated to in the district court are erroneous. "It is well settled that stipulations of fact fairly entered into are controlling and conclusive, and courts are bound to enforce them, . . . even if the government is the party bound." *A. Duda & Sons Coop. Ass'n v. United States*, 504 F.2d 970, 975 (5th Cir. 1974) (citations omitted). The State will, therefore, not be permitted to attack on appeal the statistics to which it stipulated below.

16. All statistics are drawn from the district court's findings of fact unless indicated otherwise. The district court also found that blacks comprise 33.7% of the male population aged 21–64 in the parish in 1962 and 34.4% of the same population in 1963. The male population was used because at the time of Barksdale's indictment and prosecution, females were not placed on jury duty unless they specifically requested to serve. Both the State and Barksdale agreed that so few women asked to be placed on jury duty that the male population was the relevant one.

17. The percentage of blacks appearing on different venires has been a major source of contention between the parties. The race of the individuals on the venire is determined by looking back to the very short "questionnaire" included on the summons sent to the prospective jurors. The questionnaire asked for the race of the person. The dispute arises from the fact that some people left the question blank, and others marked "C." The marking "C" is, of course, ambiguous—the person could have meant either "colored" or Caucasian.

Barksdale argued before the district court that the persons whose race is unknown should be distributed by considering 32% of them to be black and the remainder white. Barksdale argues this distribution is fair, or if it favors one party or the other, it favors the State. The argument is that roughly 32% of the eligible population (*i. e.*, of jury age, five years or more of education, and not occupationally exempt) is black and therefore the unknowns should roughly reflect that figure. Barksdale argues this distribution favors the State because less than 14% of the people on the venire whose race is known are black. He argues there is no reason to presume that blacks are represented in any greater number among the part of the venire whose race is unknown than in the venire as a whole.

The State, on the other hand, argued before the district court that the persons whose race is unknown should be considered to be 50% black and 50% white. It bases its argument on the fact that at one point the race of 13 people listed as "undetermined" was determined. Of the 13, 7 were black. The State argues therefore that 50% of all persons whose race is unknown should be considered to be black. The district court adopted that argument and based its findings of fact on the 50% figure. While the soundness of such a ruling is statistically suspect, we cannot say the district court was clearly erroneous in so ruling.

The State argued before this court, however, that 100% of the persons whose race is undetermined should be considered to be black. It bases its argument on a supposed "stipulation" by Barksdale's trial counsel to that figure. A careful reading of the record, however, reveals that tne statement to which the State refers was made in the context of attempting to gain compliance by the jury commissioner with Barksdale's Subpoena Duces Tecum for jury records. The jury commissioner refused to comply with the subpoena, stating the records were not reliable because of the number of people who did not indicate what their race was or who marked it "C." In an attempt to obtain some records from the jury commission, Barksdale's attorney requested the court to take judicial notice of the fact that a "C" means colored. The trial court, however, refused this request and also refused to order the jury commission to comply with the subpoenas. Thus, even if the statement could be considered to be a proposed stipulation, it was never accepted by the court.

For purposes of this appeal, we will adopt the district court's finding and consider 50% of those whose race is unknown to be black.

population figures of 38.8% in 1962 and 39.5% in 1963, leading to 23.9% and 25.2% disparities in 1962 and 1963, respectively. Under any calculation, those disparities are large enough to suggest that race-neutral criteria were not being used when placing names on the jury venire.[18]

■ Because both grand and petit juries were selected from the names which appeared on the general venire, it is clear that to the extent the petitioner shows systematic exclusion of blacks from full participation on the general venire, he has proved the existence of both grand and petit jury discrimination.

The district court made no findings of fact on the disparities which existed over a period of years. Barksdale did not produce evidence of the percentage of blacks on the general venire over a period of years, but did present uncontroverted evidence[19] of the number of blacks appearing on grand jury venires over an eight-year period. As the grand jury venires were chosen randomly from the general venire it can be assumed, absent evidence to the contrary, that the disparities which existed between the percentage of blacks on the grand jury venires and the general population over that eight-year period are approximately the same as existed between the percentage of blacks on the general venire and those in the general population.

Using the statistics the petitioner presented on grand jury venires, it is obvious that the disparities which existed in 1962 and 1963 are not isolated instances of a disparity, but are typical of the disproportionate representation of blacks in the jury system throughout the years. The average disparity between the percentage of blacks in the general population[20] and the percentage of blacks on the grand jury venires[21]

18. These disparities are not appreciably reduced when statistics of the male jury-aged population are used. The district court found 33.7% of the male population aged 21–64 was black in 1962, and 34.4% of the same population was black in 1963. Comparing those figures to the percentage of blacks in the general jury venire, there is an 18.8% disparity in 1962, and a 20.1% disparity in 1963. This should be compared to the 14% disparity between the jury-aged population and the jury system participation found to constitute a prima facie case in *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and the observed 11% disparity in *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). *See* note 10, *supra*.

19. This evidence was controverted to the limited extent of the argument over how to distribute individuals whose race was unknown.

20. Neither party presented evidence of what the percentage of blacks in the population was for each year between 1954 and 1962. Unlike the Supreme Court in *Castaneda*, see note 8, *supra*, we cannot assume the black population remained constant over those years because we have census data to the contrary. While there was no evidence on the number of blacks in the population for each of those years, the numbers can be derived using the Three Point LaGrangian Interpolation, a statistical interpolation relied on by Barksdale and implicitly adopted by the district court. Using the 1950, 1960 and 1970 census data, the following general population statistics are derived for the years 1954–1962:

| Year | Total Parish Population | Total Black | % Black |
|------|------------------------|-------------|---------|
| 1954 | 160,906 | 48,338 | 30.03% |
| 1955 | 160,176 | 48,767 | 30.45% |
| 1956 | 159,319 | 49,163 | 30.86% |
| 1957 | 158,338 | 49,525 | 31.28% |
| 1958 | 157,224 | 49,854 | 31.71% |
| 1959 | 155,986 | 50,150 | 32.15% |
| 1960 | 154,621 | 50,412 | 32.60% |
| 1961 | 153,128 | 50,641 | 33.07% |
| 1962 | 151,510 | 51,059 | 33.70% |

Over that eight-year period, therefore, blacks averaged 31.76% of the population of the Parish.

The formula for the Three Point LaGrangian Interpolation is as follows:

$$P_2(X) = \frac{(X - X_1)(X - X_2)}{(X_0 - X_1)(X_0 - X_2)} f(X_0) + \frac{(X - X_0)(X - X_2)}{(X_1 - X_0)(X_1 - X_2)} f(X_1) + \frac{(X - X_0)(X - X_1)}{(X_2 - X_0)(X_2 - X_1)} f(X_2)$$

21. These figures are taken from a stipulation entered into between the State and Barksdale and were originally introduced at Barksdale's trial as a part of his motion to quash the Indict-

(and thus presumably also on the general venires) from 1954 through 1962 is 20.29% with a range of 18.7% to 22.21%.[22] The petitioner clearly has proved a prima facie case of jury discrimination with these statistics.[23]

To buttress the prima case made through the statistical showing, there is evidence that the jury selection system used in Orleans Parish was subject to abuse by one who was of a mind to discriminate. The first step in the selection process was taken by the jury commission subpoenaing people to appear for jury service qualification. The commission admittedly did not subpoena all males[24] of jury age. It excluded those who could claim an occupational exemption from jury service under La.R.S. 15:174, such as physicians, firemen, attorneys and teachers. Additionally, it did not subpoena those who worked as day laborers for companies the commission knew from past experience would not pay its workers while they were on jury duty. This process of not subpoenaing a large group of day laborers was specifically at issue in *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966), *cert. denied*, 386

U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), and is discussed at length in that opinion.

The evidence presented by Barksdale showed the jury commission would subpoena some, but not all, individuals listed in the city directory who had not previously been qualified to serve on juries. It was stipulated in the district court that approximately one-third of those summoned to appear before the jury commission were black. As the percentage of black males aged 21–64 in the population of the parish was roughly one-third, it would appear that the use of the city directory was not the source of any racial discrimination. While nearly one-third of those summoned were black, only 14.9% of those on the jury wheel as of January 1962, were black. There is approximately an 18% disparity between the percentage of blacks summoned to appear before the commission and those whose names were included on the jury list. At this phase of the procedure the race of the potential jurors was obvious to the members of the jury commission as the individuals

ment. These figures, however, unlike those in the initial stipulation, are combined for each year, rather than presenting the numbers for each individual grand jury. Also, the column labeled Number of Blacks is derived by adding 50% of all persons whose race was unknown to the number of person known to be black. If that resulted in a fraction, the fraction is rounded up and the person is considered black.

| Year | Total Grand Jury Venire | Number Black | % Black | Number of Blacks on Final Grand Jury |
|------|------|------|------|------|
| 1954 | 150 | 17 | 11.33% | 0 |
| 1955 | 175 | 19 | 10.85% | 2 |
| 1956 | 150 | 16 | 10.66% | 0 |
| 1957 | 200 | 19 | 9.50% | 3 |
| 1958 | 200 | 19 | 9.50% | 3 |
| 1959 | 200 | 21 | 10.50% | 4 |
| 1960 | 150 | 19 | 12.66% | 3 |
| 1961 | 150 | 20 | 13.33% | 4 |
| 1972 | 175 | 26 | 14.85% | 4 |

22.

| Year | % Black in General Population | % Black on Grand Jury Venire | Disparity |
|------|------|------|------|
| 1954 | 30.03% | 11.33% | 18.70% |
| 1955 | 30.45% | 10.85% | 19.60% |
| 1956 | 30.86% | 10.66% | 20.20% |
| 1957 | 31.28% | 9.50% | 21.78% |

| Year | % Black in General Population | % Black on Grand Jury Venire | Disparity |
|------|------|------|------|
| 1958 | 31.71% | 9.50% | 22.21% |
| 1959 | 32.15% | 10.50% | 21.65% |
| 1960 | 32.60% | 12.66% | 19.94% |
| 1961 | 33.07% | 13.33% | 19.74% |
| 1962 | 33.70% | 14.85% | 18.85% |

23. The district court made only limited findings of fact relating to the representation of blacks on petit jury venires. The district court found that blacks comprised 13.9% of petit jury venires in 1962 and 21.8% of petit jury venires in three months of 1963. Comparing those figures to the general population figures, disparities of 24.9% in 1962 and 17.7% in 1963 are revealed.

Those figures may be supplemented with the statistical information on the general venire derived from the grand jury venires from 1954 through 1962. Because proposed petit jury venires were chosen randomly from the general venire, we can assume the disparities found between the grand jury venires and the general population are approximately the same as were present between the proposed petit jury venires and the general populations.

24. *See* note 16, *supra*.

were required to appear personally before the commission. In prior cases, the Court has recognized that there is an opportunity for abuse in a system which permits the race of the potential juror to be known by the people selecting the jury. *See Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Ross v. Wyrick*, 581 F.2d 172 (8th Cir. 1978). The large reduction in the representation of blacks at this stage would suggest that perhaps advantage was taken of that opportunity.

In order to impanel a grand or petit jury, the jury commissioners chose a venire randomly from the general jury venire. In 1962 and 1963, the years for which we have statistics on the percentage of blacks on the general venire, this process of selecting grand and petit jury venires resulted in jury venires with virtually the same percentage of blacks as the general venire.

For petit juries, after the jury commission had selected a proposed petit jury venire, the judge of each section would reduce that section's venire approximately in half to arrive at a final petit jury venire. Again at this point in the selection process the race of the potential juror was known to the selection agent. The evidence shows that there was virtually no reduction in the representation of blacks at this level,[25] suggesting that race was not taken into account by the trial judges when they granted excuses in order to reduce the proposed petit venire to the final petit venire.

There is evidence of race consciousness, however, in the impaneling of grand juries. Twice a year a grand jury venire was drawn randomly from the general venire. The judge in charge of the grand jury for that term of court would select twelve people to serve on the grand jury from the grand jury venire. The record suggests that beginning with the September 1958 Grand Jury there was a systematic attempt to place two blacks on every grand jury— there were two blacks on each grand jury from September 1958 through September 1962, except for the September 1960 Grand Jury, which had only one black.

Barksdale argues that this sequence of black participation on the grand jury (2–2–2–2–1–2–2–2–2) evidences discrimination through limited inclusion. We agree. The evidence shows that in nine grand juries, where the number of blacks on the venire varied from six to fourteen, the number of blacks selected to serve did not vary at all, except for the one jury which had only one black.[26]

25. In 1962, for example, the final petit jury venires were 13.9% black, only 1% less than the percentage of blacks in the general venire.

26. Judge Edward A. Haggerty, Jr., who impaneled the September 1960 Grand Jury which had only one black on it testified at the hearing on Barksdale's Motions to Quash that "I had selected two Negroes and one didn't show up. I had alternatives in mind and I called for him at that time. I had selected two Negroes to serve on the grand jury in 1960." T. 246. Were it not for the absence of that party, there would have been two blacks on *every* grand jury from the time *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), was decided through the Grand Jury which indicted Barksdale. *Eubanks* held that the judges and jury commissioners of Orleans Parish had been intentionally excluding blacks from grand jury participation, and directed that such conduct must stop. This court suggested in *Goins v. Allgood*, 391 F.2d 692 (5th Cir. 1968), that while total exclusion had perhaps ended with *Eubanks*, that exclusion through limited inclusion was present in the *Barksdale* case. 391 F.2d at 696–97.

As further evidence that there was race consciousness in the selection of grand jurors, Judge Thomas M. Brahney, Jr., testified in regard to the impaneling of the grand jury which had two blacks on it: "I distinctly recall there were two or three colored prospective jurors and one of them didn't wish to serve and even after I appointed them and one of them took ill and I called several others . . . one of them became ill and called to see if I could replace him and one had a heart condition, and he quit the jury." It appears then that when one black grand juror fell ill he was purposefully replaced with another black, suggesting the judge was not making race-neutral selections.

The statistician who testified for Barksdale indicated that the probability of having only two blacks on each of those juries but one, given the amount of variance in the number of blacks on the venire, is less than one in a thousand. *See also* Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338 (1966). The district court made no finding of fact on this point, indicating that it was faced with "totally opposing views of competent and qualified experts," and that therefore Barksdale had failed to carry his burden of proof, at least to the extent that his case was based solely on the statistical improbability of that sequence of representation of blacks. First, it is clear that Barksdale has proved a prima facie case of jury discrimination independent of the highly suspicious sequence of grand jury participation. Second, we find the trial judge improperly found the experts' testimony to be in total conflict. On the contrary, the two experts were not responding to the same issue.

Barksdale's expert testified only that the probability was less than one in a thousand that the 2–2–2–2–1–2–2–2–2 sequence was produced by a selection system that was race neutral. The State's expert, on the other hand, testified that given the percentage of blacks on each venire, having two black grand jurors on a jury was not statistically unusual. That is undisputed. The problem with the State's analysis, as recognized by the trial judge during the evidentiary hearing, is that it fails to address itself to the question raised by Barksdale. The question is not whether having only two blacks on a grand jury, given the number of blacks on the venire, is sufficiently statistically unusual to suggest it is the product of a race-conscious selection process, but whether the *consistent* selection of two black grand jurors is sufficiently unusual to suggest there is not a race neutral selection process.

Analogous would be the flipping of two coins. If one coin came up heads and the other tails, a statistician would explain that this is not unusual; that, in fact, this is the likely result. If, however, the same two coins were flipped ten times and each time one came up heads and the other tails, there would be an understandable suspicion that something was amiss (perhaps the coins were not "fair" coins).

This was essentially the problem with the "conflicting" testimony of the two experts. The State's expert testified that given the number of blacks in the venire, on each draw of a random selection the most likely result would be two black jurors—just as one "head" and one "tail" is the most likely result of any given flip of two coins. The question that requires an answer, however, is not what was the most likely number of blacks on each grand jury, but whether consistently getting that number suggests that something besides a race-neutral selection was being made. As the State's expert did not address himself to that question, the only evidence in the record is the testimony of Barksdale's expert. The trial judge's finding that the evidence was hopelessly conflicting was, therefore, clearly erroneous. We hold that the sequence of black representation on the grand juries from September 1958 to September 1962 was sufficiently unlikely that it constitutes additional evidence of discrimination in the impaneling of grand juries in Orleans Parish.

B. *Did the State Rebut Barksdale's Prima Facie Case?*

The rejection by the majority in *Castaneda* of the position of the dissent that the burden of presenting narrowed statistics is on the petitioner makes it clear that it is the State's burden to produce such evidence. At the hearing below, however, *Barksdale* presented some evidence which can be used to narrow the population to a more precise group than simply the general population or even the jury-aged population. Inasmuch as it was the State's burden to produce this evidence, any ambiguities or missing statistics must be construed against the State, rather than against Barksdale.

The position of the State on appeal is two-fold: first, the disparities between the

**270**

eligible population and the jury system are not as great as those found by the district court when adopting the State's Proposed Findings of Fact and under its revised statistics Barksdale did not prove a prima facie case; second, any disparity may be explained by the lower educational achievements of blacks at the time in question and by the fact that a greater percentage of blacks than whites worked for companies which would not pay them while they were serving on jury duty and hence were given hardship deferments. We find the State's first proposition antithetical to the process of appellate review and the second proposition unsupported by the evidence.

In its brief, the State argues at length that the statistical disparities found by the trial court are wrong because they are based on improperly constituted statistics. A careful reading of the Proposed Findings of Fact submitted by the parties reveals that many of the findings proposed by Barksdale were stipulated to by the State. When the State and Barksdale disagreed on a proposed finding, the trial court uniformly accepted the State's proposed finding. While this court must reverse findings of fact which are clearly erroneous, we find these findings are not clearly erroneous. Furthermore, they were proposed by the State. It is inconsistent with the appellate process to permit a litigant to propose findings of fact at trial and then argue on appeal that those findings are clearly erroneous.[27]

At the time Barksdale was indicted and tried, the qualifications for jury service were established by La.R.S. 15:172. That statute required jurors to be citizens of the state, 21 years or older, residents of the parish for one year prior to service on a jury, able to read and write English, not under interdiction or charged with any offense, not have a felony conviction, and of well-known, good character and standing in the community. Women were exempt from jury service unless they specifically request-

ed to serve, La.Const. art. 7, § 41. Additionally, individuals in certain groups were permitted to excuse themselves from jury service. This included persons over the age of 65, the physically infirm, and those in certain occupations. La.R.S. 15:174.

In the district court, Barksdale argued that the relevant population was comprised of residents of Orleans Parish between the age of 21 and 64 who were literate and not occupationally exempt during the years in question. The State did not dispute that at the hearing, but on appeal argues that because the age exemption is personal and not exercised by everyone, excluding those persons 65 and older from the statistical population results in misleading statistics. Even if the State is correct in this assertion, it had the burden of presenting evidence of what the disparities would have been had a valid age-narrowed population been examined. The State presented no evidence to the district court on this issue. We must conclude, therefore, that the exclusion from the population of those over 64 was proper, see Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), or that it made no difference in the found disparities.

Additionally, the State argues on appeal that the literacy figures presented by Barksdale are misleading because they were interpolated from census data for 1960 and that there was no evidence presented as to how much education should be required in order for a person to be considered literate.[28] The State further argues that there is no way to ascertain at what level of education an individual is literate. That may be so; however, Castaneda establishes that the burden of proving such factors is on the State and not the petitioner.

In Castaneda the Court looked at the population which had "some schooling." Barksdale has presented the court with more sophisticated evidence, namely, the percentage of the male jury-aged population having five years or more of education.

27. See note 15, supra.

28. The census data presents statistics in terms of years of education completed rather than "literacy."

This was the educational level utilized in *Labat v. Bennett,* 365 F.2d 698, 728 (5th Cir. 1966), *cert. denied,* 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), and again in *Newman v. Henderson,* 539 F.2d 502 (5th Cir. 1976), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977). It may or may not be that persons with more than four years of education were uniformly sufficiently literate to have served on a Louisiana jury in the early 1960's. The State, however, did not present any evidence to show why using five years or more of education would be improper. As this was its burden, we must assume that five years of education was generally sufficient to satisfy the literacy requirement. The trial court found that in 1962 blacks comprised 31.9% of the jury-aged population not occupationally exempt having at least five years of education. There was no comparable finding of fact for 1963 or any other year, although Barksdale did present evidence that the literate male jury-aged population in 1963 was 32.7% black. Comparing these refined population statistics to the percentage of blacks appearing on the general venire in 1962 and 1963, disparities of 17% and 18.4% are found. Again, these are highly significant disparities.[29]

It is asserted by the State that any disparity between the presumptively eligible population and the general venire must have been created at the qualification process before the jury commission. We agree. At the hearing before the district court the State introduced, without objection from Barksdale, a stipulation which had been entered into a different case. The stipulation covered the testimony the Chairman of the Jury Commission would have given had he been called in that case.[30] He would have testified that the disparity between the presumptively eligible population and the jury pool is explainable because:

> an exceedingly large number of the Negro males who appear before the Jury Commissioners disqualify themselves by

stating either that they cannot read or write or that they have had only a very small amount of formal schooling, or by showing that they are self-employed or that their employers will not excuse them from work and will not pay them their wages if they serve on a jury. . . .

▮ It is well established that conclusory statements by judges and jury commissioners that there was no discrimination in jury selection will not rebut a prima facie showing; there must be some proof. *See e. g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (per curiam); *Eubanks v. Louisiana,* 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); *Pierre v. Louisiana,* 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); *Ross v. Wyrick,* 581 F.2d 172 (8th Cir. 1978). In the testimony of the Jury Commission Chairman, the court is presented with little more than what prior courts have held is inadequate to satisfy the State's burden of proof. As was the case in *Pierre v. Louisiana, supra,* the chairman's attempt to explain the disparity primarily in terms of different literacy levels between blacks and whites is not supported in the record. The evidence shows that even if those with less than five years of education are excluded from the relevant population, there is a significant disparity between the representation of blacks in the general population and those in the jury system.

The State's position that the remainder of the disparity is explainable in terms of the arguably benign system of excusing "hardship" cases is without merit. *Labat v. Bennett,* 365 F.2d 698, 719 (5th Cir. 1966), *cert. denied,* 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), held that such is not an acceptable explanation for the disparity. It

---

**29.** Barksdale's expert testified that the probability a disparity that large was produced by a race-neutral selection system is less than one in ten thousand.

**30.** By the time of the hearing in the district court, Commissioner Knowles, Chairman of the Jury Commission at the time of Barksdale's indictment and trial was dead.

is true that in *Labat* there was language to suggest that *all* daily wage earners had been excluded, and it was the systematic exclusion of the entire class which was unacceptable. The evidence in the case, however, demonstrated that many but not all wage earners were eliminated either by never being sent subpoenas, by being excused by the commission when they came in to be qualified, or by being excused by the trial judge when he reduced the proposed petit venire to the final petit venire or when he chose grand jurors. 365 F.2d at 714–15.

■ While the *Labat* court suggested that it was the total exclusion which was unconstitutional, it cited with approval *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), in which the Supreme Court stated: "Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole *or in part* without doing violence to the democratic nature of the jury system." 328 U.S. at 223, 66 S.Ct. at 987 (emphasis added) (footnote omitted). While state court grand juries are not bound by federal cross-section requirements but only by equal protection guarantees, state court petit juries must be comprised of a cross-section of the community in order to satisfy the Sixth Amendment, *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). Thus, while *Thiel* is not strictly applicable, as it was expressly founded on the Court's supervisory power over lower federal courts, it is certainly persuasive authority for the proposition that the exclusion of wage earners need not be as complete as Judge Wisdom may have suggested in *Labat* in order to constitute a denial of the right to a jury comprised of a cross-section of the community. This is especially so when the exclusion of wage earners creates a 17–18% disparity between the presumptively eligible population and the participation in the jury system.

■ Thus, we hold that the practice which existed in Orleans Parish in the early 1960's of excluding many wage earners was unconstitutional, and therefore cannot be used by the State as an explanation for the disparity which existed in 1962 and 1963 between the eligible black population and the number of blacks within the jury system.

Excluding different literacy levels as a justification for the large disparities because it is unsupported by the record, and excluding the wage earner exception because it is itself unconstitutional, the State is left without a legitimate non-discriminatory explanation to rebut Barksdale's prima facie case.

Accordingly, we reverse and remand the case, and direct the district court to enter an order that the conviction of Bruce Barksdale be set aside and that he be reindicted within 60 days or be released from state custody.

REVERSED AND REMANDED.

AINSWORTH, Circuit Judge, dissenting:

The majority's action in this case, annulling a 17-year-old Louisiana state court conviction of confessed rapist Bruce Barksdale, now serving a life sentence for his crime, brings to mind the perceptive observation of Justice Black where he wrote: "It is seemingly becoming more and more difficult to gain acceptance for the proposition that punishment of the guilty is desirable, other things being equal." *Kaufman v. United States,* 394 U.S. 217, 240–41, 89 S.Ct. 1068, 1081, 22 L.Ed.2d 227 (1969) (Black, J., dissenting).

Uncontroverted evidence presented at his trial for aggravated rape in Criminal District Court in Orleans Parish, Louisiana, conclusively shows that on the morning of October 3, 1962, petitioner Bruce Barksdale followed a young woman into her apartment building on Chartres Street, in New Orleans' French Quarter, after seeing her return from the grocery store. He knocked on her door and inquired whether a couch in the hallway of the apartment was for sale. The young woman opened the door to respond to the request when Barksdale forcibly slammed the door open, shoved the

young woman back into her apartment, and threatened her with a raised hammer. The victim tried to run past her assailant but was grabbed before she could reach the stairway in the apartment building, and was forcibly brought back into her apartment and the door was locked behind her. After robbing his victim, Barksdale dragged her into the bedroom and shoved her face down into the bed. He placed his knee in the middle of her back, and informed her that "I'm not going to hurt you if you do as I tell you." Barksdale ordered the woman to remove her blouse, and he ripped her underwear off. Then, with his hammer still in his hand, Barksdale raped his victim. Barksdale then informed his victim that "[y]ou know I am going to have to kill you now." She begged hysterically for her life, and Barksdale relented after requiring her to "swear on a Bible" that she would tell no one of the incident. As he left the apartment, Barksdale grabbed the young woman again by the throat and gave her this warning: "If you ever tell anybody about this I will kill you. I have before and I will again, and I better not see you on the streets."

Several hours later the victim was found in an extremely agitated and distressed condition by her landlord, who managed to extract an account of what had happened. She was able to give the police a description of her assailant, from which a police composite drawing was made. Two workers at a hotel across the street from the victim's apartment also gave police descriptions of a man with a hammer seen in the vicinity of the apartment that morning. On the basis of these leads, the police were able to apprehend Bruce Barksdale the next morning.

Barksdale was positively identified by his victim on October 4, the day following the attack, in a lineup held in a show-up room at New Orleans police headquarters. The two workmen also identified Barksdale at the lineup as the man with the hammer they had seen in the vicinity of the victim's apartment on the day of the attack.

Clothing seized from Barksdale at the time of his arrest matched the victim's description of her assailant's apparel. A hammer similar to the one described by the victim was also recovered. Scientific tests of Barksdale's clothing revealed seminal fluid in the genital region of his garments. Furthermore, cat hair removed from Barksdale's clothing was found to match cat hair taken from the victim's bed, clothing and pet cat.

On October 5, at around 9 a. m., Barksdale informed a police officer outside his cell that he wished to speak with the officers that had apprehended him the day before. The Detective Bureau was notified, and one of the arresting officers came to Barksdale's cell. Barksdale informed the officer that he wished to make a statement. Barksdale was then taken to the Detective Bureau General Assignments Office, where he dictated a statement that was taken down verbatim on a typewriter by a police lieutenant.[1] The facts in the statement are the same as those related by the rape victim as a witness at Barksdale's trial.[2]

At trial, counsel for Barksdale presented no evidence in his favor and offered no

---

1. At trial, the police officer who typed the statement testified that he took down the statement exactly as dictated by Barksdale, using phonetic spellings when necessary.

2. The full text of Barksdale's confession, along with several questions asked by police officers following the statement, follows:
   Statement of one Bruce Barksdale, CM, age 27 yrs, residing 1121 Ursuline St, rear apartment, relative to the Aggravated Rape of one _____, WF, 21 yrs residing _____ Chartres St, upper front apartment, which occurred at 9:30 AM, on Wednesday, October 3, 1962 at _____ Chartres St.

STATEMENT

Early last Wednesday morning. I'd say about nine o'clock, I was helping this white man move abed, out his house to his car; on Dumaine between Chartres and Decatur. I saw this girl, white girl, come by pulling this dog along. She was carrying a grocery bag. And I laughed the way she was pulling the dog, and she looked at me and laughed. So after I got through helping the man, I was on my way back of town and I saw her again. She was going in her door. And the door was opened, it was closed but unlocked. I passed on by, and went halfway to the corner and stopped and came back. And I went inside the place in the hall. And I went upstairs and I seen where the

defense. Indeed, except for some perfunctory cross-examination of police officers regarding the voluntariness of Barksdale's confession, counsel for Barksdale did not even cross-examine the victim or other witnesses produced by the state. The scientific tests, eyewitness identifications and other evidence linking Barksdale to the crime were all admitted without objection.[3] Furthermore, throughout the long and tedious

dog had made some mess and I figured that was her place. And I knocked on the door, and she opened the door. They had a sofa laying outside the door in the hall and I asked her if she wanted to sell it. She was nervous and upset, I guessshe was scared of me. The door was opened, and I reched at her but I missed, and then she tried to run out the door. Then reched at her and grabbed her by her arms and I pulled her back in, and then I closed the door. I couldn't lock the door with the chain and I told her to lock the door, and she locked the door. I asked her for money, she say she didn't have no money, she hand me a dollar and I give it back to her. Seemed to me like she got nervous and start to whining like she was gitting ready to holler, and that's when I got the hammer from my back pocket. I drew it back at her, and she say don't hurt me and I told her I wasn't going to hurt her. I told her to take off her clothes, she had on a tie on skirt, and she took it off. She was scared, she kept saying don't hurt me, don't hurt me. And I told her to go lay on the bed. She lay on the bed on her back but she lay kinda across the bed. I reched down and tore her pants off. Then I took my private out and got on top of her. Then I put my private in her, and while I was intercoursing I made her kiss me and I made her stick her tongue out and I went to kiss her again and she put her tongue back in. She told me you gonna hurt me and I told her no I'm not going to hurt you and I took the hammer and threw it on the bed next to her. She was sitting on the bed and I was standing up. This was after I finish with her and I had come in her. I had put my private back in my pants and closed my pants. I told her I say I know you gonna call the police. She say man no I ain't gonna call the police, I'm from Illinois. And I say I don't care I betcha you still gonna call the police. And she say you gonna hurt me and I say. no I ain't gonna hurt you. I say would you swear on a bible you ain't gonna call the police and she say she don't swear and she say she ain't got no bible. I say if this was someone else I betcha if you say you gonna call the police they'd kill you. I told her open the door and let me out. And as I walk out the door I say I know you gonna call the police. She say man, I don't wanna die. I ran on down the stairs, then after I got outside I walked back of town on Ursuline street one block and I caught the bus on Royal and Ursuline, I went to Canal Street and transferred to the City Park bus and I went back by my brother's house at 2429 St. Ann. And I stayed there and I changed clothes completely, and I waited and went to Parish Prison and seened my brother. Then I came back to 2429 St. Ann and changed back into my own clothes excepting the shirt. The I jist stood around and watched the ball game and then I went home. Then the next day I'd say it was a little bit before the ball game come on around noon I guess, the police apprehended both me and my wife by my house. And they booked me at the First Precinct, and they took my wife in another police car. They told me they were booking me with aggravated rape. Then this morning I told the turnkey I wanted to talk to one of the Detectives that arrested me and tell 'em the truth about everything. He say he would git 'em. And this Officer asked me if I would be willing to put my story down in writing and I say yeah. And that's when he brought me up here to make the statement.

The following questions were propounded by Officer Jerry Chatelain and the corresponding answers were given by Bruce Barksdale.

Q. What kind of hammer was it that you used in raping this girl?

A. A small iron crate opener, the one that the police got from 2429 St. Ann.

Q. When did you take the hammer off the bed?

A. After I'd asked to swear to God she wouldn't call the police.

Q. Did she seem scared or cry while this was going on?

A. She was scared and cried while I was intercoursing her.

Q. Is this all that you know about the above?

A. That's all there is to know about it.

Q. Did anybody promise you anything to make this statement, or did they threaten you to get you to make this statement?

A. No, of my own free will. Cause I'm guilty of what I'd done. I wish that it'd help me.

(s) <u>Bruce Barksdale</u>
Bruce Barksdale

This statement taken in the Detective Bureau in Police Headquarters on Friday, October 5, 1962, typed by D/Sgt. Paul Dyer in the presence of Officer Jerry Chatelain, and completed at 10:30AM.

Note: In this footnote the name and address of the victim have been deleted from the above confession to protect her identity.

3. The above recital of facts was taken entirely from the transcript of testimony before the state criminal trial court, which was included as an exhibit to this habeas petition.

judicial reexamination of this case by petitions for habeas corpus in both state and federal courts, Barksdale's confession has never been challenged for its accuracy, reliability, voluntariness, or admissibility. Barksdale, in short, is clearly guilty. He does not contend, in this habeas petition, in a single line or phrase, that he is innocent.

The jury's determination of guilt, however, in this case as in so many others, was hardly the end, or even the beginning of the end, "but only the end of the beginning." Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 142 (1970). Prior to trial, Barksdale, who is black, filed a document entitled "Motion to Set Aside Jury Commission, General Jury Venire, Grand Jury Venire, Grand Jurors and Petit Jury Venire" on the ground of racial discrimination based on systematic exclusion of blacks. This motion was denied by the trial court, and after conviction Barksdale appealed to the Louisiana Supreme Court, contending that blacks had been unconstitutionally excluded from the jury venires in his case. The Louisiana Supreme Court, in a unanimous decision, found no unconstitutional exclusion of blacks from the Orleans Parish jury venires

and upheld the conviction. *State v. Barksdale*, 247 La. 198, 170 So.2d 374 (1964). The United States Supreme Court denied Barksdale's petition for a writ of certiorari. *State v. Barksdale*, 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed.2d 236 (1965). Approximately two years later, Barksdale filed his first state habeas petition, which was ultimately denied by the Louisiana Supreme Court. *State ex rel. Barksdale v. Dees*, 252 La. 434, 211 So.2d 318 (1968). Petitioner filed a second state habeas petition, which was also finally denied. *State ex rel. Barksdale v. Henderson*, 257 La. 551, 242 So.2d 886 (1971).

Barksdale then filed this habeas petition in federal district court. The majority opinion traces the tortuous path traveled through all levels of the federal court system since the filing of that petition.[4] Suffice it to say that after the most recent federal court hearing in this case, the district judge was of the opinion that "the evidence and testimony adduced by the state adequately explains and justifies" the statistical disparities noted by the majority opinion. In my view the judgment of the trial judge should not be disturbed.

4. As noted by the majority, at one point Barksdale's instant petition was consolidated with that of John Newman for the purpose of an evidentiary hearing before a federal magistrate. After the hearing before the magistrate, the cases were separated and sent back to the district judges to whom the cases initially had been assigned. The district judge set aside Newman's conviction, and the state appealed. The Fifth Circuit originally reversed the district court and affirmed the conviction, on the ground that Newman had waived his objections regarding the jury panel. *Newman v. Henderson*, 496 F.2d 896 (5th Cir. 1974). The Supreme Court vacated that opinion, and remanded for reconsideration of the waiver argument relied upon. *Newman v. Henderson*, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976). On remand, without briefs from the parties, the Fifth Circuit reversed itself and set aside Newman's conviction. *Newman v. Henderson*, 539 F.2d 502 (5th Cir. 1976). In a supplemental brief, the state recites that in *Newman* it "was given no opportunity to fully present the issues to the Court." Supplemental brief of appellee at 6.

Although the court notes in footnote 3 that it "expressly declines to decide whether the *New-*

*man* decision could collaterally estop the State of Louisiana from relitigating the legality of the September 1962 Grand Jury," the state should not be bound by the conclusion of the court in *Newman*. The state offered no factual defense or memoranda of law to the district court in the *Newman* case, or in the original hearing in district court in this case. A new state District Attorney, recognizing the gravity of these cases, sought a rehearing in the *Barksdale* case, and for the first time presented evidence to rebut Barksdale's allegations. *Barksdale v. Henderson*, 510 F.2d 382 (5th Cir. 1975), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). A new hearing was not sought in *Newman* because, at the time, the Fifth Circuit had reversed the district court on the ground that the petitioner had waived his challenge to the jury. *Newman v. Henderson*, 496 F.2d 896 (5th Cir. 1974). Thus, when *Newman* was finally decided by the Fifth Circuit, the state had not attempted to rebut the allegations of racial discrimination in that case. Therefore, *Newman* should not govern this case in which the state is contesting Barksdale's contentions of racial discrimination.

The district judge noted that since the decision in *Eubanks v. Louisiana,* 365 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), black representation in Orleans Parish jury venires has undergone dramatic change—with black representation on proposed petit jury venires rising from 6.2% in 1952 to 14.9% in 1962. Furthermore, the court found that at the time of Barksdale's conviction the Orleans Parish jury commissioners were not excluding the "entire class" of "daily wage earners," a practice found to have a prohibited discriminatory impact in *Labat v. Bennett,* 365 F.2d 698 (5th Cir. 1966).[5] The district judge concluded that evidence introduced by the state

> indicates that [at] the time of petitioner's trial the jury commission and the judges were not engaged in invidious racial discrimination and purposeful exclusion of blacks as a class from jury service on the grand and petit juries. The testimony and evidence demonstrates that an attempt was being made to comply with the dictates of *Eubanks.* Although obviously at this early date disparities had not been reduced to the desired percentages, a sincere effort to achieve this was in effect. . . . The record in this case shows that the dramatic increase in black representation in the jury venires was not tokenism. *Castenda v. Partida, supra* holds that the statistical disparities may be explained. We believe that the evidence and testimony adduced by the state adequately explains and justifies those disparities in this case.

Not satisfied with the factual and legal determinations of the federal trial judge in this case, the majority today relies upon a series of statistical computations to set aside this conviction. But statistics, like most descriptive devices, can sometimes be used to support—and even compel—a preconceived result. The statistics bantered about in this case are an excellent example

of this phenomenon. Barksdale presented the expert testimony of Dr. Arnold Levine, Professor of Mathematics, Tulane University, to support his contention that there was statistical evidence of racial discrimination in the selection of jurors at the time of his conviction.[6] To counter Dr. Levine's computations, the State of Louisiana offered the testimony of Dr. David W. Smith, Associate Professor of Experimental Statistics, Louisiana State University, who concluded that there was no evidence of nonrandom selection of grand jurors in Orleans Parish at the time of Barksdale's trial.[7] The professional resumes of both professors are impressive, both appear to be highly qualified and competent statisticians, and both reach divergent conclusions. Thus, this case is not, as the majority opinion suggests, merely an example of this court responding to a clearly defined set of facts. Before the court can hold for Barksdale today, it has to decide which set of facts—the state's or Barksdale's—is worthy of belief.

If the statistical evidence proposed by Barksdale's expert is accepted, racial disparities between the black population in Orleans Parish and blacks appearing in the general venire, the grand jury venire, and petit jury venires at the time of his conviction approach 20%. Such disparities are apparently sufficient under the majority view to establish a prima facie case of racial discrimination. If, however, we turn from Dr. Levine's figures to those presented by the State of Louisiana through Dr. Smith, an entirely different view of the Orleans Parish jury selection process is presented.

The state contends on the basis of this expert testimony that the disparity between the eligible black population and the number of blacks on the general jury venire is only 8.7%, the difference between the percentage of blacks with a fifth- or sixth-grade education (26.2%) and the percentage

---

5. *Labat* dealt with improper jury selection in Orleans Parish for a period ending in 1953. The district court in this case specifically concluded that the exclusion of daily wage earners, found objectionable in *Labat,* did not occur in 1962–63, the critical period in this case.

6. Levine, *Detection of Non-Randomness in Jury Selections.*

7. Smith, *A Critique of "Detection of Non-Randomness in Jury Selections."*

of blacks in the jury wheel as of January 1, 1962 (17.5%).[8] As for the disparity between the general black population and those serving on Orleans Parish grand juries, the state's figures again show a substantially smaller gap than that proposed by Barksdale, only 11.2%.[9] If the court were to adopt the state's contention that an eighth-grade education is essential to become a qualified grand juror, the disparity would be a mere 5.8%.[10] Such statistical disparities are insufficient to establish a prima facie case of racial discrimination. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (disparity of 10% insufficient to state prima facie case); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974) (disparity of 11% insufficient for prima facie case).

The statistical evidence in this case, therefore, is not as compelling as is suggested by the majority. The trial judge, who was in a position to explore fully the statistical evidence presented by experts Levine and Smith, found no unconstitutional exclusion of blacks from Orleans Parish jury venires at the time of Barksdale's conviction. That determination of the factfinder—the trial judge—should stand.

Barksdale's collateral attacks on his criminal conviction have received repeated hearings and have consumed many hours of judicial time.[11]

The proverbial man from Mars would surely think we must consider our system of criminal justice terribly bad if we are willing to tolerate such efforts at undoing judgments of conviction. He would be surprised, I should suppose, to be told both that it never was really bad and that it has been steadily improving . . ..
His astonishment would grow when we told him that the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime.

Friendly, *supra* at 145. Never throughout the 17 years that Barksdale's petitions have been before various courts has there been the slightest intimation that he is innocent of the crime for which he was convicted. As Judge Friendly asserted in the above-cited article, with only few exceptions, "convictions should be subject to collateral attack only when the prisoner supplements his constitutional plea with a colorable claim of innocence." *Id.* at 142. Here, where Barksdale's constitutional arguments shed no doubt on the issue of his guilt, the court should be especially wary to set aside his conviction on grounds as ethereal as the Three Point LaGrangian Interpolation, referred to in footnote 20 of the majority opinion to ascertain the black population for years where no actual figures are available. The hieroglyphic

$$P_2(X) = \frac{(X - X_1)(X - X_2)}{(X_0 - X_1)(X_0 - X_2)} f(X_0) + \frac{(X - X_0)(X - X_2)}{(X_1 - X_0)(X_1 - X_2)} f(X_1) +$$

$$\frac{(X - X_0)(X - X_1)}{(X_2 - X_0)(X_2 - X_1)} f(X_2)$$

8. Brief for appellee at 30 31.

9. This disparity is the difference between blacks with a fifth- or sixth-grade education, 26.2% of the Orleans Parish population, and the percentage of blacks actually serving on grand juries, 15%. Brief for appellee at 33.

10. This disparity is the difference between the percentage of blacks with an eighth-grade education, 20.8%, and the percentage of blacks actually serving on grand juries between 1958 and 1962, 15%. Brief for appellee at 33.
Admittedly, the above statistics are obtained by imposing an educational requirement which tends to constrict the pool of qualified black candidates. However, it is not unreasonable to require some level of educational achievement in prospective jurors. *See Carter v. Jury Com-*

*missioners*, 369 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 991 (1970).

11. This petition alone has received four separate evidentiary hearings in federal court. In February 1973, the first evidentiary hearing was had before a United States magistrate. Relying on a magistrate's report, the district judge (J. Christenberry) granted Barksdale's petition for habeas corpus. One year later, that judgment was vacated and a second evidentiary hearing was held before Judge Christenberry. Before judgment could be rendered, Judge Christenberry died. Consequently, a third evidentiary hearing was held before a newly appointed federal judge (J. Schwartz). At this third hearing, the state introduced statistical evidence to counter that presented by

employed by Barksdale's expert Levine, and used by the court in footnote 20, does not compel the conclusion that Barksdale should prevail. It merely adds to the confusion of statistics in this case.

Although the majority opinion formally leaves reindictment and retrial of Barksdale as a possibility, the long period of time which has elapsed since the commission of the crime and the trial in state court, with the attendant difficulties in reassembling evidence, "makes this a matter of theory only." Friendly, *supra* at 147. Thus, in practical effect the majority decision sets free a person whose guilt of a serious and heinous crime is apparent beyond a reasonable doubt.

Justice Black stated that "[i]n collateral attacks whether by habeas corpus or by § 2255 proceedings, I would always require that the convicted defendant raise the kind of constitutional claim that casts some shadow of a doubt on his guilt." *Kaufman v. United States*, 394 U.S. 217, 242, 89 S.Ct. 1068, 1082, 22 L.Ed.2d 227 (1969). Such a view is consonant with the historical use to which the Great Writ has been put. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (Powell, J., concurring). As Mr. Justice Powell stated in his concurring opinion in *Schneckloth*, the "central reason" for habe-

as corpus is "the affording of means, through an extraordinary writ, of redressing an unjust incarceration." *Id.* at 257–58, 93 S.Ct. at 2063. That central purpose is not served by the majority decision,[12] especially where the decision runs contrary to the factual determinations of the federal trial judge and is based upon highly doubtful and even conjectural statistics relating to alleged racial discrimination in jury selection. Accordingly, I dissent.

---

Barksdale. On April 1, 1977, Judge Schwartz rendered an opinion denying Barksdale's petition. Because of a factual error in the opinion, both parties moved for a new trial, and the district court granted the motion for a partial new trial. At this fourth evidentiary hearing, both parties introduced additional evidence. In June 1978, Judge Schwartz rendered a new opinion again denying Barksdale's petition for habeas corpus.

12. The Supreme Court in *Rose v. Mitchell*, —— U.S. ——, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), held that a claim of racial discrimination in the selection of a grand jury foreman presented an issue cognizable on habeas corpus regardless of the guilt or innocence of the petitioner and regardless of whether the state had previously granted a full and fair hearing to the petitioner's claim. However, the portion of the opinion so holding has questionable precedential value, for as noted by Mr. Justice Powell in his concurring opinion, "not all of the four Members who join it support even the Court's judgment." *Id.* at ——, 99 S.Ct. at 3014 n. 3 (Powell, J., concurring). The Supreme Court's judgment in *Rose* may not be the final word on this

subject. As noted by Mr. Justice Powell in his concurrence:

Whenever a federal court is called upon by a state prisoner to issue a writ of habeas corpus, it is asked to do two things that should be undertaken only with restraint and respect for the way our system of justice is structured. First, as one court of general jurisdiction it is requested to entertain a collateral attack upon the final judgment of another court of general jurisdiction. Second, contrary to principles of federalism, a lower federal court is asked to review not only a state trial court's judgment, but almost invariably the judgment of the highest court of the State as well. These considerations prompt one to inquire, more critically than this Court ever has, whether it is appropriate to allow the use of habeas corpus by state prisoners who do not seek to protect their personal interest in the justness of their convictions. *Id.* at ——, 99 S.Ct. at 3012 (Powell, J., concurring).

